# EXHIBIT "C"

01-41989
MAB/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KIM HADAWAY,<br>    PLAINTIFF, | §<br>§<br>§<br>§<br>§ | |
| VS. | §<br>§<br>§ | CIVIL ACTION NO.<br>4:11-CV-03574<br><br>(JURY) |
| LIFE LINE SCREENING OF<br>AMERICA, LTD.,<br>    DEFENDANT. | §<br>§<br>§<br>§ | |

ORAL DEPOSITION OF:

## KIMBERLY ELAINE HADAWAY

JANUARY 09, 2013

## *ORIGINAL*



WORLDWIDE
*Systems Technology for the Litigation World*

Litigation Group◆Court Reporting◆Video Production◆Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

KIM HADAWAY,                          )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )  CIVIL ACTION NO. 4:11-CV-03574
                                      )
LIFE LINE SCREENING OF                )          (JURY)
AMERICA, LTD.,                        )
                                      )
          Defendant.                  )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

KIMBERLY ELAINE HADAWAY

JANUARY 9, 2013

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF KIMBERLY ELAINE HADAWAY,
produced as a witness at the instance of the
Defendant, and duly sworn, was taken in the
above-styled and numbered cause on the 9th day of
January, 2013, from 10:06 a.m. to 2:49 p.m.,
before Mary Burkes, CSR in and for the State
of Texas, reported by machine shorthand, at the
law firm of Warren & Siurek, L.L.P., 3334 Richmond
Avenue, Suite 100, Houston, Texas 77098, pursuant
to Notice, and the Texas Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

```
 1
 2    THE STATE OF TEXAS        )
 3    COUNTY OF HARRIS          )
 4           I, Mary Abbott Burkes, Certified Court
 5    Reporter, duly commissioned and qualified in and
 6    for the State of Texas, do hereby certify that
 7    there came before me on January 9, 2013, at Warren
 8    & Siurek, L.L.P., 3334 Richmond, Suite 100,
 9    Houston, Texas 77098, the following named person;
10    to wit, KIMBERLY ELAINE HADAWAY, who was by me duly
11    cautioned and sworn to testify to the truth and
12    nothing but the truth of his knowledge touching and
13    concerning the matters in this cause; and that said
14    witness was thereupon carefully examined upon his
15    oath and his examination reduced to writing under
16    my supervision; that it is a true record of the
17    testimony given by the said witness, that said
18    witness requested review and signature of the
19    deposition; that changes, if any, made by the
20    witness were returned and are contained on the
21    Correction Page attached to the original
22    transcript.
23           I further certify that I am neither
24    attorney for nor counsel for, nor related to nor
25    employed by any of the parties in the action in
```

**Worldwide Court Reporters, Inc.**
**(800) 745 - 1101**

137

```
1    which this statement is taken, and further that I
2    am not a relative or employee of any attorney or
3    counsel employed by the parties hereto, nor
4    financially interested in this action.
5              IN WITNESS WHEREOF, I have hereunto affixed
6    my hand and seal of office on this, the
7    ____16th____ day of _January____, 2013.
8
9              ____Mary Abbott Burkes____
              Mary Abbott Burkes,
10             Certified Shorthand Reporter
              In and for the State of Texas
11             Certification No. 5199
              Date of Expiration: 12/31/13
12
13
14   Worldwide Court Reporters
     Firm Registration No. 223
15   3000 Weslayan, Suite 235
     Houston, Texas 77027
16   (713) 572-2000
17
18
19
20
21
22
23
24
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745 - 1101**

135

```
 1          I, KIMBERLY ELAINE HADAWAY, read the
 2    foregoing deposition and hereby affix my signature
 3    that same is true and correct, except as noted
 4    above.
 5
 6                        Kim Hadaway
                   KIMBERLY ELAINE HADAWAY
 7
 8    THE STATE OF  Texas )
 9    COUNTY OF  Harris )
10          Before me,            , on this day
11    personally appeared KIMBERLY ELAINE HADAWAY, known
12    to me (or proved to me under oath of through
13    _____ ) (description of identify card or other
14    document) to be the person whose name is subscribed
15    to the foregoing instrument and acknowledged to me
16    that they executed the same for the purposes and
17    consideration therein expressed.
18          Given under my hand and seal of office this
19    14th day of April , 2013.
20                   Susan M Diedrich
                   NOTARY PUBLIC IN AND FOR
21                 THE STATE OF  Texas
22
23        SUSAN M DIEDRICH
          NOTARY PUBLIC, STATE OF TEXAS
          MY COMMISSION EXPIRES
24        AUG. 5, 2015
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745 - 1101**

134

Kim Hadaway

1   WITNESS NAME _____   DATE OF DEPOSITION: 1/9/13

2   CHANGE                LINE              REASON

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A.  That's not the way I understood it.  I

2    mean, we had home offices, which was essentially a

3    satellite office to the corporate office, and I

4    worked from there.

5    Q.  Okay.  I'm going to put in front of you a

6    document marked as Exhibit 2, which is your

7    application for employment with Life Line Sales.

8              (Deposition Exhibit No. 2 was marked.)

9    Q.  (BY MS. GOODSON)  Is that a true and

10   correct copy of your application and resume

11   submitted to Life Line Sales?

12   A.  Yes.

13   Q.  And you'll note the highlighted portion,

14   when you state the reason for leaving Pacesetter

15   and seeking employment with Life Line Sales is your

16   desire to work in outside sales.  Is that accurate?

17   A.  Yes.

18   Q.  And now would you like to change your

19   statement when you stated that you did not

20   understand the health services coordinator position

21   to be outside sales?

22          MR. SIUREK:  I object -- I object to

23   that mischaracterization of your testimony.  You

24   can answer the question, but it has been asked and

25   answered, and I am going to object to the

38

1      A.   I really don't recall the conversation, you
2  know.
3      Q.   Okay.
4      A.   It was a long time ago.
5      Q.   If you will look at your application, which
6  is Exhibit 2, what percentage did you indicate that
7  you would be willing to travel?
8      A.   50.
9      Q.   Okay.  Do you recall discussing that at all
10  with any of the people that interviewed you,
11  including Joe, Alan, and Dave?
12      A.   I don't recall the actual conversation.
13      Q.   Do you recall talking about what specific
14  territory that you would be responsible for in any
15  of the interviews that you had?
16      A.   We discussed the west -- or it was -- the
17  job available was the west territory.
18      Q.   And what is the west territory?
19      A.   Well, at that time it was south of I-10,
20  east to about -- and forgive me.  North, south,
21  east, west.  But I-10 to Highway 6, south to
22  Victoria and about where I lived, probably.  It was
23  probably about the bottom, and Needville was near
24  the bottom of -- Lake Jackson.  Lake Jackson was
25  probably the southern -- the southeast side bottom

1    of the territory.

2         Q.   Okay.  And just for the record, you do live

3    in Needville; is that correct?

4         A.   Yes.

5         Q.   Okay.  And in that discussion about what

6    territory you would be responsible for, was there a

7    discussion about your ability to travel within that

8    territory?

9         A.   There must have been.  I don't recall the

10   words or the conversation.

11        Q.   When you were -- when were you officially

12   offered the job?

13        A.   I don't know for sure.  I would think it

14   would have been about November, because I started

15   December 4th.

16        Q.   And who offered -- officially offered you

17   the job position and how, in what manner or means?

18        A.   I believe it was Alan, but I'm not positive

19   who the actual offer came from.

20        Q.   Was it a phone call?

21        A.   I think it was an e-mail.  I think it was a

22   call and an e-mail.

23        Q.   Did you receive a copy of the employee

24   handbook when you first began working for Life Line

25   Screening?

62

```
1    conference calls, those kinds of things, maybe a
2    particular trip somewhere for, you know, regional
3    meeting or that kind of thing.  My calendar is just
4    appointments, meetings, things like that.  It
5    doesn't really represent the time of the day,
6    the -- you see what I mean?
7         Q.  Okay.  I follow you.  I follow you.
8                 You have a home office; is that correct?
9         A.  Yes.
10        Q.  Describe for me your home office.
11                MR. SIUREK:  When she was at Life Line?
12                MS. GOODSON:  Yeah.  Sorry.  Thank you
13   for clarifying.
14        Q.  (BY MS. GOODSON)  When you were at Life
15   Line.  So for 2007, 2008, 2009, 2010, were you
16   living in the same house during that time period?
17        A.  Yes.
18        Q.  Okay.  And was your home office a separate
19   room?
20        A.  It was, part of the time.
21        Q.  Okay.
22        A.  I would say -- I would say two and a half
23   years in what would have been a bedroom was the
24   office, and the rest of the time the desk was moved
25   out to the den.
```

1    daughter was always very responsible and would get

2    herself up, but make sure she was up.  And

3    generally I would be on the computer checking

4    e-mails and whatnot while she was getting ready for

5    school.  And then take her to school around 8:00.

6              And then come back home and work.  And

7    work depended on whether it was a day in the office

8    or if I needed to go out to the field.  And that

9    varied.  But work throughout the day, finish up

10   sometime between 5:30 and 6:30, have dinner, a

11   little TV, whatever, with the family.  The family

12   would go to bed, and I would almost always get back

13   on the computer and check things for end of day and

14   be ready for the next morning and sometimes work

15   into the night if things needed to be done,

16   "into the night" meaning 11:00, 12:00, 2:00 o'clock

17   in the morning sometimes.

18      Q.  And how many days a week were you out in

19   the field, approximately?

20      A.  Well, it really varied.  In the beginning

21   with the new territory, I was in the field much

22   more because it was a new territory and it needed

23   to be worked, it needed to be prospected to see

24   what the sites were.  Once you settle into these

25   positions, you have established accounts and

1    Q.  Okay.  And so, for example, in the month of

2    June, 2009, when you've been on the job for a year

3    and a half --

4    A.  Uh-huh.

5    Q.  -- it looks like you were sick two days of

6    the month but out in the field every other day

7    except for nine days; is that correct?

8    A.  Yes.

9    Q.  Okay.

10   A.  Now, "in the field" may have been an hour

11   or two hours, not necessarily the whole day.  I'm

12   not sure if you're familiar with these areas.

13   Q.  I am from the region and very familiar with

14   these areas.  But, you know, for example, you drove

15   83 miles on --

16          MS. GOODSON:  Whoa, thunder.

17   Q.  (BY MS. GOODSON)  -- 83 miles on June 8th

18   into -- from Needville into the Sharpstown area.

19   So you were out in the field at least an hour and a

20   half in terms of drive time.

21   A.  Uh-huh.

22   Q.  Okay.

23   A.  Yeah.

24   Q.  And so, for example, for that month, you

25   submitted 1,660 miles for reimbursement; is that

72

1    correct?

2         A.   Yes.

3         Q.   Okay.   And so when you were out in the

4    field, what were you doing?

5         A.   Sometimes prospecting a ZIP code to see

6    what -- where would be a good venue, what the town

7    looked like, what the neighborhoods looked like,

8    just geographically and -- because it was important

9    to have a venue that accommodated our needs

10   physically that day, but it was also important to

11   have it, you know, on the right side of town, you

12   know, maybe a few blocks away might do better, or a

13   popular place.   And you can -- you have to see that

14   to -- it's not the same as at home.

15        Q.   And the purpose for prospecting it and

16   making sure it was an appropriate venue and site

17   and in an appealing area was so that more people

18   would attend the screenings; is that true?

19        A.   So you would have a higher probability of a

20   good turnout if you did it in the better area, if

21   the facility was nice, that kind of thing.

22        Q.   Okay.

23        A.   Also maintaining relationships.   I mean,

24   there's a lot of that with the hospitals and doing

25   things for them, speaking events and --

**Worldwide Court Reporters, Inc.**
**(800) 745 - 1101**

1     Q.  And the benefit of maintaining a

2  relationship is that you would get continued

3  bookings and additional screening events and

4  continued screening events; is that correct?

5     A.  Well, yes.  It's important to have the

6  relationship.

7     Q.  Okay.  And the number of screening events

8  that you schedule and facilitate and the number of

9  participants of each event directly correlated to

10  your revenues; is that correct?

11     A.  Well, the number of screenings was decided

12  by the company.  So I was given ten ZIP codes and

13  had to have those ZIP codes filled with screening

14  events.  So those are just -- they're there.

15  That's -- a screening event is there.  But the

16  relationships and the venues make a difference.

17     Q.  Right.  Okay.  And so when you're out in

18  the field maintaining a relationship, you're doing

19  that to facilitate continued events that

20  participants can attend; is that correct?

21     A.  Continued availability of that venue.  You

22  know, when you find a good venue, you want that

23  church secretary or that pastor or that activities

24  director to stay in that relationship with you so

25  that next time, you can just pick up the phone and

74

1   say, "Hey, I need to have a screening in September

2   and" --

3      Q.  And you know you can have it, you're know

4   it will be there, and you know it will be well

5   attended; is that correct?

6      A.  That's the relationship side of it.

7      Q.  Okay.  What about Sunday pulpit

8   announcements?  Did you ever attend any services or

9   facilitate any Sunday pulpit announcements?

10     A.  Very few.

11     Q.  Okay.

12     A.  I didn't want to work on Sundays.

13     Q.  Community workshops?

14     A.  There were some.  I did fewer workshops --

15   and that's what we call them at Life Line

16   Screening, is workshops.  Some people might say

17   "seminar" or "event" or whatever.  Workshops.  I

18   did do workshops but fewer than, really, any of the

19   other HSCs.  Fewer than my quota, probably.

20     Q.  Describe to me what a community workshop

21   is.

22     A.  For instance, going to a church that has a

23   quilting group or a seniors group or a YMCA that

24   has a seniors group or maybe a corporation who

25   wants a "lunch and learn" for their employees.  And

1    you go there and you do an educational program.

2              Now, I became a speaker for the American

3    Heart Association pretty quickly after I went to

4    work for Life Line Screening, and so I would do

5    educational programs based on the American Heart

6    Association's information.  And that was helpful.

7    That's another relationship building tool, because

8    that's helpful to an activities director or helpful

9    to the church secretary who needs an activity.

10   That -- it's called "Ten Ways to Love Your Heart."

11   I still do it.

12       Q.   When you perform these community

13   workshops, are you advocating on behalf of Life

14   Line Screenings for these individuals to attend a

15   screening and/or get screened for, you know,

16   blockages, et cetera?

17       A.   Uh-huh, uh-huh.  Not in a sales fashion.  I

18   approach the workshops and the educational programs

19   as education and giving back to the community.

20   That's the way -- as a matter of fact, when I spoke

21   for the American Heart Association, one of their

22   requirements was to not talk about Life Line

23   Screening.

24             MS. GOODSON:  Objection to the

25   nonresponsive portion of that answer.

1              You can answer it again.

2       A.   It was 80 hours per paycheck.

3       Q.   (BY MS. GOODSON)   And you knew that you

4   were going get paid -- that your paycheck would

5   have that amount in it every week; is that correct?

6   Every other week when you were paid; is that

7   correct?

8       A.   Yes.

9       Q.   And then there was a component that would

10  change based on how much commissions you earned; is

11  that correct?

12      A.   Yes.   They're revenue-driven.

13      Q.   So, to some extent, you had an amount that

14  you were guaranteed, that you knew you were going

15  to get, and a portion that would change based on

16  revenues driven -- for the jury we will -- I just

17  want to clarify that that means it is the number of

18  participants that attend the screening; is that

19  correct?

20      A.   Yes.

21      Q.   Okay.   And your community workshop speaking

22  events were conducted -- while you may have had

23  noble intents to do it for educational purposes,

24  you benefited if those listeners attended a

25  screening event; is that correct?

98

```
1    calculations.
2         A.   Okay.
3         Q.   And I just -- if you have any reason to
4    dispute these, they don't sound right, let me know.
5                   So, in 2007, my numbers -- and -- oh,
6    excuse me.  I'll just tell you, my numbers are
7    based on earnings statements that --
8         A.   Okay.
9         Q.   -- were produced in this case.  My numbers
10   show that you received $54,894 total compensation.
11   Does that sound about right?
12        A.   In '07?
13        Q.   In '07, yeah.
14        A.   Yes.
15        Q.   And that 11,144 was commission.  Does that
16   sound about right?
17        A.   Yes.
18        Q.   So that's about 20 percent of your pay was
19   based on commission; is that correct?
20        A.   Yes.
21        Q.   Looks like in 2008 you substantially
22   increased your end pay, and you made about $69,393.
23   Does that sound about right?
24        A.   Yes.
25        Q.   Okay.  And your commissions doubled.
```

1    Sounds like you got the hang of things.  And so you
2    had 24,496.  Does that sound about right?
3        A.  Yes.
4        Q.  So that's about 35 percent, approximately.
5    Does that sound about right?
6        A.  Yeah.  Yes.
7        Q.  2009, you had even better year.  75,567
8    total compensation.  Does that sound about right?
9        A.  Yes.
10       Q.  Okay.  $40,125 of that was commission.
11   Does that sound approximately right?
12       A.  Yes.
13       Q.  So that's approximately 53 percent of your
14   compensation that year was based on commissions?
15       A.  Yes.
16       Q.  Does that sound right?
17       A.  Yes.
18       Q.  That's a fantastic year.
19               And then it looks like 2010, down a
20   little bit but still really good.  $62,573 total
21   compensation.  Approximately, right?
22       A.  Yes.
23       Q.  Okay.  And 29,861 of that was commission,
24   which would be about 47 percent.
25               Do you have any -- does that sound in

100

1    the realm of reasonable of what you remember?

2        A.  Sounds ballpark for what I think, yes.

3        Q.  Okay.  Just want to make sure there's not

4    something I'm missing.  Okay.

5            So, you know, based on what we looked at

6    earlier in terms of your mileage reimbursement

7    sheets, is it reasonable for us to agree that you

8    spent sometimes three, sometimes four, sometimes

9    two, but often at least three to four days out in

10   the field somewhere, a week?

11       A.  Until the transition to Metro HSC and RIS.

12       Q.  Okay.  We'll talk about that in a second.

13            Prior to this transition; is that

14   correct?

15       A.  Yes.  Those are correct.

16       Q.  Okay.  And is it correct that this

17   transition occurred in October of 2010?

18       A.  No.

19       Q.  When would you -- when do you think that

20   that transition occurred?

21       A.  The change to the Metro market was early

22   2010, meaning probably February or March and --

23   which increased my screenings in the summer,

24   because we worked three to four months out.  And

25   then I was switched to regional inside sales in

```
 1    do you specifically recall a change?
 2        A.  Our titles -- my title stayed health
 3    service coordinator throughout.
 4        Q.  Okay.  So you're not contending that your
 5    job title actually changed?
 6        A.  My job duties changed.  I don't -- the
 7    title wasn't -- no one cared about the title.
 8        Q.  Listen to my question.  You're not
 9    contending that your job title changed; is that
10    correct?
11        A.  Correct.
12        Q.  Are you contending that your job title
13    changed?
14        A.  No.  It did not change.
15        Q.  Okay.  Specifically what do you contend
16    changed about your duties?
17        A.  I went from an HSC 10 model to a Metro --
18    HSC Metro which was 20-ish screenings a month, and
19    then to regional inside sales, which was 30-ish
20    screenings a month.
21        Q.  Okay.
22        A.  When I think of "title," I think of your
23    business card, and that stayed "HSC."
24        Q.  And that answers my question, you know.
25    When I look at the bottom of your e-mails, your
```

1    haven't seen it, and so I don't -- I just don't --

2        Q.   Okay.  If I represent to you that Life Line

3    Screening's HR records indicate that the shift

4    happened on October 8th, I mean, would you have

5    any -- I mean, tell me what you -- upon what facts

6    you would dispute that.

7        A.   I would dispute it with documentation that

8    I have in the -- in the files given to you.

9        Q.   Okay.

10        A.   I mean, in this moment, I can't --

11        Q.   Right.  I've got the files right here.

12        A.   I'd have to show you.

13        Q.   So, I mean, we can go there if we have to.

14    So tell me what -- tell me what in the files --

15        A.   Territory plans, e-mails, and ZIP code

16    lists that I was working on for January 2011 and

17    out.  I was looking into months ahead.

18        Q.   Okay.  What e-mails?

19        A.   I have an e-mail from -- I have an e-mail

20    from Christy Carro that says, "Are you RIS now,"

21    and I said, "Yes, ma'am."  So that e-mail is in

22    there, and that would have the date on it.

23             There's bound to be e-mails with Susan,

24    my manager.  And there are dated territory plans

25    and ZIP code lists that were sent to me to work on

1      A.   Well, the company transitioned from HSC

2   10s, which they called the face of the company.

3      Q.   Okay.

4      A.   They were the face of the company.   The

5   teams were the faces of the company.   And they

6   transitioned through Metro on to RIS, as not being

7   out there in the face of the company anymore.   You

8   didn't go out and see people.   You did everything

9   on the phone and on the computer and through

10   Salesforce.   The marketing was done on the computer

11   and on the phone, whereas before, marketing was

12   relationships.

13      Q.   Okay.  Did you still have a mileage

14   reimbursement budget during all of these --

15      A.   I don't think so in the end.   When I say

16   "the end," I mean the RIS position.   I think there

17   was some mileage for the Metro, and I was a little

18   bit different than the other HSCs because I managed

19   all those hospital contracts.

20      Q.   Okay.  Did you still submit mileage in

21   2010?

22      A.   Yes.

23      Q.   So -- and I'm going to draw an objection,

24   probably, from Mark, but I'm just asking because

25   I don't remember your answer.

112

1          When did you first come to -- or come to

2    an understanding or belief that you were not being

3    paid correctly under the law?

4          MR. SIUREK:  Objection.

5          Now, you're entitled to answer her

6    question with the following admonition.  If you --

7    if you derived any of your understanding of your

8    entitlement to overtime based on discussions you

9    had with anyone from our firm or otherwise, I

10   instruct you not to answer.  If you have any

11   knowledge independently, of not being paid overtime

12   correctly, you're entitled to answer.  Okay?

13          THE WITNESS:  Okay.

14      A.  I thought that overtime should be paid,

15   because if you missed time and didn't have time

16   accrued, then it was deducted.  So if you're going

17   to deduct on one end, then you should pay on the

18   other.

19      Q.  (BY MS. GOODSON)  And when did you first

20   come to that understanding or belief?

21      A.  I always thought that.

22      Q.  Okay.  Did you talk to HR about that?

23      A.  No.

24      Q.  I will refer you to Exhibit 3, which is the

25   employment handbook for Life Line Screening, and I

**Worldwide Court Reporters, Inc.**
**(800) 745 - 1101**

1  will specifically refer you to page 11 and the

2  paragraph entitled "Error in Pay."

3          And it says if -- essentially, if you

4  have any questions -- and I'm paraphrasing here.

5  I'm not reading.  I'm just paraphrasing.  But if

6  you have any questions or you believe that you

7  have -- you are being improperly paid, you should

8  bring that to the attention of human resources

9  department.

10          And you received a copy of this; is that

11  correct?

12      A.  I received a copy.

13      Q.  And you reviewed this.  You signed an

14  acknowledgement that said you reviewed it and you

15  will abide by all the terms and policies; is that

16  correct?

17      A.  Uh-huh.

18          MR. SIUREK:  Is that a "yes"?

19      A.  Yes.

20      Q.  (BY MS. GOODSON)  And you did not report

21  anything to HR at any time during your three years

22  of employment; is that correct?

23      A.  No.

24      Q.  But only after you were terminated and

25  sought counsel is the first time that you

1    of what my plan was for the week, or "What ZIP code

2    are you going to," or "What hospital are you going

3    to," that kind of thing.  That's what that

4    one-on-one call was for, is to say, "Okay.  This is

5    the week."

6                    And everything we did -- everything we

7    did had to be approved.  There was a different

8    approval form for everything under the sun.  So

9    there wasn't, you know, really any decisions

10   without you going through one, sometimes two

11   people.

12       Q.   Okay.  But you generally came up with your

13   plan and then got an approval, versus somebody

14   telling you, "On Tuesday at 1:00 o'clock, you need

15   to go visit with Memorial Hermann"; is that

16   correct?

17       A.   Yeah, right.

18       Q.   And when you're at home working from your

19   home office, what types of things would you have

20   been doing?

21       A.   You start -- everything starts with a ZIP

22   code.  We get a territory plan.  We get our ZIP

23   plans, that look like big graphs, that tell us in

24   January you have to be at these 10 ZIPs or 20 ZIPs

25   or 30 ZIPs or whatever.  And you start with the ZIP

nov 07 06 04:00p                                                                              p.2   

# APPLICATION FOR EMPLOYMENT

Life Line Screening is an Equal Opportunity Employer. We consider applicants for all positions without regard to race, color, religion, sex, national origin, age, martial or veteran status, handicap or any other legally protected status.

## CONTACT INFORMATION

| | | |
|---|---|---|
| Name (First, Last, Middle) KIMBERLY HADAWAY ELAINE | | Social Security #: 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 |
| What name or nickname do you prefer to go by? KIM | Email Address: kimhadaway@earthlink.net | |
| 6634 MILDRED RD | City: NEEDVILLE | State: TX    Zip: 77461 |
| Daytime Phone #: 713-201-5728 | Evening/Cell Phone#: 713-2015728 | |

## EMPLOYMENT HISTORY

Please list your employment history for the last 7 years, up to 3 employers. If you are still currently employed, leave the End Date box blank.

| Name and Employer PACESETTER | | | Location (City & State) HOUSTON, TX | | Title SALES & CUSTOMER SERVICE REPRESENTATIVE |
|---|---|---|---|---|---|
| From (Month/Year) 04/1999 | To (Month/Year) PRESENT | Reason for Leaving DESIRE TO WORK IN OUTSIDE SALES | | Last Weekly Salary $900. + BONUS | May we contact? NO |
| Name and Employer TX QUANTUM MGMT | | | Location (City & State) HOUSTON, TX | | Title ADMINISTRATOR |
| From (Month/Year) 8/1997 | To (Month/Year) 04/1999 | Reason for Leaving COMPANY WAS SOLD / OPPORTUNITY W/ PACESETTER WAS BETTER | | Last Weekly Salary $1154. + BONUS | May we contact? COMPANY CLOSED |
| Name and Employer HOWARD SCHREIBER, M.D. | | | Location (City & State) HOUSTON, TX | | Title PRACTICE MGR |
| From (Month/Year) 03/1991 | To (Month/Year) 04/1999 | Reason for Leaving OPPORTUNITY FOR GROWTH | | Last Weekly Salary $1154. + BONUS | May we contact? YES |

## PERSONAL/JOB INFORMATION

| | |
|---|---|
| Expected Rate of Pay: NEGOTIABLE / COMPARABLE W/ CURRENT SALARY | What date would you be available to begin work? AFTER TWO WEEK NOTICE TO PACESETTER |

Have you ever been employed by Life Line Screening: NO — If Yes, when/where?

Are you able to perform, with or without accommodations, the job related functions for the particular position for which you are applying?   YES

If no, describe how you would perform these job-related functions and with what accommodations:

How did you learn about Life Line Screening? A FRIEND OF SANDY DALLAS — Do you require sponsorship to work in the US?   NO

Would you be willing to relocate?   YES — If yes, where? OPEN TO OPPORTUNITIES

Would you be willing to travel?   YES — If yes, how often? (Select one)   10%   20%   30%   40%   (50 %)   60%   70% of the time?

Have you ever been convicted of a felony or misdemeanor? (Conviction will not necessarily disqualify you for employment.)   NOT CONVICTED BUT WAS CHARGED AND ACCEPTED DEFERRED ADJUDICATION ALONG W/ PROBATION

If yes, please disclose condition: PLEASE REFER TO EMAIL/FAX INFORMATION PREVIOUSLY SENT TO DAVE MORIN

DEPOSITION
EXHIBIT
2

LIF 00280

Nov 07 06 04:08p                                                            p.3

## EDUCATION INFORMATION

Please list all College Degrees, highest first. Do not include high school information, unless that is your highest degree. If you are still attending any Education Institution, leave the graduation date blank.

| Name of the Institution | Location (City & State) | Degree Type | Course of Study/Major | Grad Month/Year |
|---|---|---|---|---|
| HOUSTON COMMUNITY COLLEGE | HOUSTON, TX | NONE | GENERAL STUDIES | NONE |
| | | | | |
| | | | | |
| | | | | |

## PROFESSIONAL LICENSURE

Must be completed by individuals applying for positions that require professional licensure, registration, or certification

| Credentialing Type | License/Serial Number | State | Effective Date | Expiration Date |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |

## REFERENCES

References are not necessary during the on-line application process, but may be requested at the time of an interview, should your application be considered favorably.

| Name | Occupation | Relationship to you | Phone # |
|---|---|---|---|
| HOWARD SCHREIBER, M.D. | PHYSICIAN | PREVIOUS EMPLOYER & FRIEND | hdeliverthem@houston.rr.com cell 713-817-9201 |
| JULIE ARNOLD | KBR - IRAQ | CO-WORKER & FRIEND | JULIE.ARNOLD@KBR.COM |
| CINNAMON SCULLY | APPLE TOWING | CO-WORKER & FRIEND | CELL 832-274-5127 |

As a condition of employment, the Company reserves the right to require applicants to submit to urine drug tests and/or blood tests or other examinations, to determine the use of any illegal or unauthorized drugs/alcohol. Employees that are covered by a collective bargaining agreement which does not allow such examinations or tests will not be subject to such.

The facts set forth in my application for employment are true and complete to the best of my knowledge. I understand that if employed, false statements on this application shall be considered sufficient cause for dismissal. I also understand that if hired, I will be required to abide by all rules and regulations of Life Line Screening. You are hereby authorized to make any investigation of my personal history as it may relate to the performance of my past job(s) or future jobs for which I am being considered.

I understand that neither this document nor any offer of employment from Life Line Screening shall be deemed to create or imply any type of employment contract. All employment shall be at will.

Signature: _Kim Hadaway_

Date _11-6-06_

**LIF 00281**

366 704 3419  (32)

**Kim Hadaway**
6634 Mildred Rd.
Needville, TX  77461
713-201-5728 cell
wlhadaway@yahoo.com

11:30

LM 9/18 → Sandy Dell

**Skills:**

**General Office**: Office Administration, Staff Supervision, Personal Secretary, Accounts Receivable Management, Accounts Payable, Customer Service, Sales, Marketing, Insurance Claims, Benefits Administration, Financial Arrangement, Bank Reconciliation, Human Resources, Profit/Loss Management, Construction Management
**Medical Office**: Medical Assistant, Medical Coding & Billing (ICD-9, CPT, HCPCS, DME, Worker's Comp, UB-92 & HCFA-1500), Insurance Claims, Account Collections, Managed Care Contracts, OSHA, HIPAA

**Software Knowledge:**

Microsoft Word, Excel, Money, Access, Outlook & Express, PowerPoint, Quickbooks, Peachtree, Quicken, Medic, Medisoft, Meditech, MedsAmerica, Medical Manager, MD Serve & AMS

**Education:**

Needville High School, graduated 1985
Houston Community College, General English and Math, 1987 - 1988
Practice Management Institute, Certified March, 2000

**Employment History:**

**4/1999 – present**
**Pacesetter Personnel, Houston, Texas**
**Sales Representative and Marketing Coordinator**
Outside sales, telemarketing, development and implementation of sales and marketing tools, marketing and design, trade show and job fair productions, research areas for growth opportunity, sales presentations, customer service, recruit, train and manage new sales representatives

**8/1997 - 4/1999**
**Texas Quantum Management Group, Houston, Texas**
**Administrator/Manager**
Customer/Client Service – Consulted with physician clients and affiliated hospital administration in regards to the management of the practice, billing and collections. Assisted in employee recruitment, staff training, marketing and patient relations. Assisted physicians in negotiating hospital contracts and start-up cost budgets.
Staff Supervision – Supervised and trained multiple (5) Texas Quantum employees as well as many physician's office employees.
Accounts Receivable Management - Managed A/R for Texas Quantum as well as thirteen physicians.
Accounts Payable - Managed A/P for Texas Quantum and Dr. Schreiber's OB/GYN group using Quickbooks Pro.
Sales & Marketing - Created sales and marketing tools for OB/GYNs. I.e. quarterly newsletters for the patients, arranged multiple television and radio spots, filmed a television commercial, arranged several open house celebrations.
Medical Coding and Billing – Database set-up and management for all CPT, HCPCS, ICD-9, and DME codes necessary for billing and collections for thirteen different practices.
Insurance Claims - Filed and followed up on insurance claims including HCFA and UB-92. Audited insurance claims.
Collections - Collected on past due accounts from patients and insurance companies. Supervised financial arrangements.
Insurance Verification – Verified insurance and worker's comp benefits for medical services. Pre-certified insurance benefits for medical services.
Fee Schedules - Set-up and managed the necessary updates on fee schedules based on geographic locations of the physician's practice.
Managed Care Contracting - Researched contracts for the physicians. Negotiated reimbursement levels. Completed applications and followed up with provider relations on status of acceptance. Created spreadsheets necessary for front office staff to remain current on which companies were in/out of network.

LIF 00282



# Employee Handbook

December 2007 (updated)



DEPOSITION EXHIBIT

3

LIF 00300



**Page Number:**

Welcome Letter                                                                                      1

**Section 1:  Introduction**                                                          2
  About this Handbook                                                    2
  At-Will Employment                                                       2
  Variations in State and Other Laws                              2

**Section 2:  Employment**                                                        3
  Equal Employment Opportunity                                   3
  Americans with Disabilities Act (ADA)                          3
  Sexual and Other Unlawful Harassment                     3
  Employee Responsibilities                                             5
  New Employee Orientation                                           6
  Standards of Conduct                                                   6
  Corrective Action                                                           6
  Investigation Procedure                                               8
  Open Communication                                                    8
  Suggestions                                                                   8
  Confidentiality / Protecting Company and Customer Information   9
  Privacy Statement                                                          9
  Immigration Law Compliance                                       9
  Work Schedule                                                              9
  Attendance and Punctuality                                        10
  Driver's License and Driving Record                            10
  Employment Classifications                                        10
  Personnel Records                                                       10

**Section 3:  Compensation**                                                   11
  Compensation Philosophy                                          11
  Pay Period                                                                   11
  Direct Deposit                                                             11
  Error in Pay                                                                 11
  Overtime                                                                     11
  Recording Your Time                                                  12
  Wage Garnishments                                                   12
  Performance Reviews                                                 12
  Employee Referrals                                                    13
  Promotion and Transfer                                             13
  Termination of Employment                                       13

**Section 4:  Benefits**                                                              14
  Eligibility for Benefits                                                  14
  Insurance Coverage                                                    14
  Health Insurance                                                         14
  Group Term Life/Accidental Death and Dismemberment (AD&D)   14
  Dental Insurance                                                         14
  Long-Term Disability Insurance                                   14

**LIF 00301**



LIFE LINE SCREENING
*The Power of Prevention*

## Section 4:  Benefits  (continued)                          Page Number:

| | |
|---|---|
| Short-Term Disability Insurance | 15 |
| 401(k) Plan | 15 |
| Employee Assistance Program (EAP) | 15 |
| Workers' Compensation | 15 |
| Unemployment Compensation | 16 |
| Federal Insurance Contribution Act (FICA) | 16 |
| Continuation of Benefits (COBRA) | 16 |
| Holidays | 17 |
| Paid Time Off (PTO) | 17 |
| Bereavement Leave | 18 |
| Jury Duty | 18 |
| Credit Union Membership | 18 |
| Complimentary Screenings | 19 |
| Educational Training Programs | 19 |

## Section 5:  Leaves                                            20

| | |
|---|---|
| General Leave Guidelines | 20 |
| Family and Medical Leave Act of 1993 (FMLA) | 21 |
| Pregnancy Leave of Absence | 23 |
| Military Leave of Absence | 23 |
| Personal Leave of Absence | 24 |

## Section 6:  Safety                                            25

| | |
|---|---|
| Safety | 25 |
| Reporting Safety Issues | 25 |
| Bomb Threats | 25 |
| Parking Lot | 25 |
| Smoking | 26 |
| Weapon Free Work Environment | 26 |
| Workplace Violence | 27 |

## Section 7:  Workplace Policies                                28

| | |
|---|---|
| Company Communications, Computers, Peripheral Equipment | 28 |
| Dress Code | 29 |
| Uniforms (Ultrasound) | 29 |
| Drug-Free Work Environment | 29 |
| Communications | 30 |
| LLS and Department Meetings | 30 |
| Housekeeping | 30 |
| Severe Weather and Emergency Conditions | 30 |
| Solicitations and Distributions | 30 |
| Employment of Relatives | 31 |
| Use of Company Vehicle | 31 |
| Expense Reimbursement | 31 |
| Media Inquiries | 32 |
| Privacy Policy | 32 |

## Acknowledgement Page                                          33

**LIF 00302**



## Section 1:  Introduction

This Employee Handbook has been prepared to inform you of Life Line Screening's employment practices and policies, as well as the benefits provided to you as a valued employee.

### About this Handbook
Life Line Screening, at its option, may change, delete, suspend or discontinue any part or parts of the policies in this Employee Handbook at any time without prior notice.   Any such action shall apply to existing as well as to future employees.

Any "deviations" (employment agreement/terms of employment) from policies in this Employee Handbook must be in writing and be signed by a company officer (CEO, President) and/or the Vice President of Human Resources.  Any verbal statement or promise made, or any written statement not signed by a company officer cannot be interpreted as a change in policy and will not constitute an agreement with an employee.

Should any provision in this Employee Handbook be found to be unenforceable or invalid, such finding applies only in the geographical area or jurisdiction in which it is issued.  Any such finding does not invalidate the entire Employee Handbook, but only that particular provision.

This Employee Handbook replaces and supersedes any and all other or previous Life Line Screening Employee Handbooks or other Life Line Screening policies whether written or verbal.

Poor job performance and/or failure to comply with the policies, procedures and other content of this handbook may result in corrective action up to and including termination of employment.

### At-Will Employment
Your employment with Life Line Screening is at-will.  This means that neither you nor Life Line Screening has entered into a contract regarding the duration or terms of your employment. Offer of employment letters are not employment contracts but an explanation of your employment status. You are free to terminate your employment with Life Line Screening at any time, with or without reason.  Likewise, Life Line Screening has the right to terminate your employment, eliminate your position, or otherwise discipline, transfer, or demote you at any time, with or without reason, at the discretion of Life Line Screening.

Employees of Life Line Screening can only enter into an employment contract for a specified period of time or make any agreement contrary to this policy with written approval from a company officer and/or the Vice President of Human Resources.

### Variations in State and Other Laws
Life Line Screening operates in many different states.  If a particular state or other applicable law contradicts any provision of this Employee Handbook, Life Line Screening will comply with such laws for the employees in those particular areas.  If you have questions regarding such issues, please contact Human Resources.

2

**LIF 00303**



## Section 2:  Employment

### Equal Employment Opportunity
To give equal employment and advancement opportunities to all people, we make employment decisions at Life Line Screening based on each person's performance, qualifications, and abilities. Life Line Screening does not discriminate in employment opportunities or practices on the basis of race, color, religion, sex, national origin, age, disability, or any other characteristic protected by law, except in cases where such a factor is a bona fide occupational disqualification.

We will make reasonable accommodations for qualified individuals with known disabilities unless making the reasonable accommodation would result in an undue hardship to Life Line Screening.

We permit reasonable accommodations for religious beliefs of qualified employees and applicants.

Our equal employment opportunity policy covers all employment practices, including selection, job assignment, compensation, discipline, promotion, termination, lay-off and access to benefits and training.

Diversity is an important value at Life Line Screening.  Embracing diversity is good for business and it enriches the experience of our employees.

If you have a question about any type of discrimination at work, talk with your immediate manager or the Human Resources Department. There will be no retaliation for asking questions regarding any suspected discriminatory situation. If, in the course of conducting an investigation, we determine that any Life Line Screening employee has illegally discriminated against another employee, that employee will be subject to disciplinary action, up to and including termination of employment.

### Americans with Disabilities Act (ADA)
As noted above, our organization is committed to providing equal employment opportunities to otherwise qualified individuals with disabilities, which may include providing reasonable accommodations where appropriate. In general, it is the employee/applicant's responsibility to notify the organization of the need for an accommodation. Upon doing so, we may ask you for your input about the type of accommodation you believe may be necessary, or the functional limitations caused by your disability. Also, when appropriate, we may need your permission to obtain additional information from your physician and/or other medical or rehabilitation professionals.

### Sexual and Other Unlawful Harassment
It is our policy to prohibit harassment of one employee by another employee or manager on any basis including, but not limited to, sex, age, race, color, physical or mental disability, veteran status, national origin, religion, or any other characteristic protected by law. The purpose of this policy is to assure that, in the workplace, no employee harasses another on any of these bases.

3

**LIF 00304**



While it is not easy to define precisely what harassment is, it certainly includes harmful or inappropriate physical contact, slurs, epithets, threats, derogatory comments or visual depictions, unwelcome jokes and teasing.

Any employee who feels that he/she is a victim of such harassment should immediately report the matter to his/her manager or any other member of management.   The company will investigate all such reports.  Adverse action will not be taken against an employee who reports or participates in the investigation of a violation of this policy.  Violations of this policy will not be permitted and may result in corrective action, up to and including termination.

**Sexual Harassment**
It is our firm policy to prohibit sexual harassment of any employee.  The purpose of this policy is to assure that no employee is subject to sexual harassment in the workplace.

Sexual harassment is illegal and is defined as unwanted sexual advances or visual, verbal, or physical conduct of a sexual nature. This definition includes many forms of offensive behavior and also includes gender-based harassment by a person the same sex as the harasser. The following is a partial list of examples of sexual harassment:
- Unwanted sexual advances.
- Offering employment benefits in exchange for sexual favors.
- Making or threatening reprisals after a negative response to sexual advances.
- Visual conduct that includes leering, making sexual gestures or displaying of sexually suggestive objects or pictures, cartoons or posters.
- Verbal conduct that includes making or using derogatory comments, epithets, slurs, or jokes.
- Verbal sexual advances or propositions.
- Verbal abuse of a sexual nature, graphic verbal comments about an individual's body, sexually degrading words used to describe an individual or suggestive or obscene letters, notes or invitations.
- Physical conduct that includes touching, assaulting, or impeding or blocking movements.

Unwelcome sexual advances (either verbal or physical), requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of employment; (2) submission or rejection of the conduct is used as a basis for making employment decisions; or, (3) the conduct has the purpose or effect of interfering with work performance or creating an intimidating, hostile, or offensive work environment.

Sexual harassment of an employee will not be tolerated.  Violations of this policy may result in disciplinary action, up to and including termination.  There will be no adverse action taken against employees who report violations of this policy or participate in the investigation of such violations.

Any employee who feels that he/she is a victim of sexual harassment must immediately report such actions in accordance with the following procedure.  All complaints will be promptly and thoroughly investigated in the following manner.

**4**

**LIF 00305**



1.   Any employee who believes that he/she is a victim of sexual harassment must report the act immediately to his/her manager.  If you prefer not to discuss the matter with your manager, you may speak directly to any other member of management or the Human Resources Department.

2.   The company will investigate every reported incident promptly.  Any employee, manager or agent of the company who has been found to have sexually harassed another employee may be subject to appropriate corrective action, up to and including immediate termination.

3.   Normally, the Human Resources Department will conduct the investigations.  The company recognizes that every investigation requires a determination based on all the facts in the matter.  We also recognize the serious impact a false accusation can have.  We trust that all employees will continue to act responsibly in regard to this topic.

4.   The reporting employee and any employee participating in any investigation under this policy have the company's assurance that no reprisals will be taken as a result of a sexual harassment complaint.  Rather, it is our policy to encourage discussion of the matter so as to help protect all employees from being subjected to similar inappropriate behavior.

## Employee Responsibilities

Life Line Screening needs your help in making each working day enjoyable and rewarding. Your first responsibility is to know your own duties and how to do them promptly, correctly and pleasantly.  Secondly, you are expected to cooperate with your fellow employees and to maintain a positive team spirit.

How you interact with fellow employees and those whom Life Line Screening serves and how you accept direction can affect the success of the organization.  All of us have an important assignment: perform every task to the very best of our abilities.

You are encouraged to seek opportunities for personal and professional development.  This handbook offers insight on how you can perform positively and to the best of your ability to meet and exceed Life Line Screening expectations.

You should have the right to make your own choices in matters that concern and control your life.  We expect you to voice your opinions and contribute your suggestions to improve the quality of Life Line Screening, so please maintain open communication with each other and with management.

Remember, you help create the pleasant and safe working conditions that Life Line Screening intends for you.  The result of your cooperation will be better performance for the company overall, and personal satisfaction for you.

**LIF 00306**



## New Employee Orientation

Upon joining Life Line Screening, you will participate in a comprehensive new employee orientation process where you will receive a complete overview of the organization including but not limited to:   benefits information, a review of this employee handbook, background information on Life Line Screening, job description, expectations and goals, and a tour of the facilities with introductions to employees. You will be asked to complete personnel, payroll, and benefit forms. At this time, you are given a copy of the employee handbook. After reading the employee handbook, please sign the receipt page and return it to Human Resources.

Your direct supervisor and department head are responsible for orienting you to the department and your job. Your supervisor and co-workers are an excellent source of information about Life Line Screening; please feel free to ask questions.

## Standards of Conduct

Whenever people gather together to achieve common goals, some rules of conduct are needed to help everyone work together efficiently and effectively. By accepting employment with us, you have a responsibility to Life Line Screening and to your fellow employees to adhere to certain rules of behavior and conduct. The purpose of these rules is not to restrict your rights, but rather to be certain that you understand what conduct is expected and necessary. Life Line Screening is a better place to work when everyone knows they can fully depend upon fellow workers to follow the rules of conduct.

Generally speaking, we expect each person to act in a mature and responsible way at all times. It is also each employee's responsibility to report any suspicious behavior or wrongdoings to his/her immediate supervisor and/or the Human Resources department.   If you have any questions concerning any work or safety rule, please see your manager.

## Corrective Action

Employees are expected to comply with Life Line Screening's standards of behavior and performance, and any noncompliance with these standards must be corrected. If you are performing below standards or expectations, your manager may use a corrective action process to provide you with notice of deficiencies and give you the opportunity to improve.   The progressive corrective action process is common at Life Line Screening, but it is not used in all cases (at the company's sole discretion), and its use is not guaranteed to anyone. Life Line Screening does retain the right to administer discipline in a manner it sees fit.

Employees may be dismissed for severe violations without a corrective action process. Severe violations or gross misconduct include a major breach of policy or violation of the law, i.e., fighting or physical assault of another employee; gross insubordination; sexual harassment; theft of company property (or another employee's property) including embezzlement; use or sale of illegal drugs on company premises; gross negligence in the performance of duties; etc.

6

LIF 00307



The four-step corrective action process includes:

Step 1 - Verbal Contact:
Your manager will meet with you to discuss where you are not meeting the standards of behavior or performance and suggest how to correct the situation.  Your manager will outline the conversation in writing in the LLS Corrective Action Form.  You should acknowledge having read it by signing it.  This document will be placed in your personnel file for future reference.

Step 2 – Written Warning:
If the unacceptable performance continues, your manager will schedule a second meeting to discuss the issue.  A third party (most likely a member of the Human Resources Department) may be present.  Your manager will discuss the severity of the unacceptable performance and complete a Corrective Action Form. You should acknowledge having read it by signing it.  This document will be placed in your personnel file for future reference.

Step 3 – Final Written Warning
If the unacceptable performance continues, your manager will schedule a third meeting to discuss the issue. This is the final opportunity to correct any deficiencies.  Your manager will discuss the severity of the unacceptable performance and complete a Corrective Action Form.  You should acknowledge having read it by signing it.  This document will be placed in your personnel file for future reference.

Step 4 - Final Stage – Termination:
If efforts to modify unacceptable performance or behavior have not been successful, or actions and deadlines in the improvement plan are not met, you may be terminated.

The corrective action process described above may also be applied to an employee who is experiencing a series of unrelated problems involving job performance or behavior.  It can be bypassed or steps skipped for serious issues on job performance or behavior, or in any situation, at the sole discretion of Life Line Screening.

Nothing in this policy is designed to modify our employment-at-will policy and we reserve the right to bypass the corrective action procedures suggested.

LIF 00308



## Investigation Procedure

The Human Resources Department will be the point of first contact to lead any investigations regarding policy violations. If you commit any of the actions listed below, or any other action not specified but similarly serious, you may be suspended without pay pending an investigation of the situation. Following the investigation you may be terminated without any previous corrective action having been taken.

- Theft
- Falsification of records of Life Line Screening
- Failure to follow safety practices
- Breach of confidentiality
- Threat of, or the act of, doing bodily harm
- Willful or negligent destruction of Life Line Screening property
- Use and/or possession of firearms, intoxicants, drugs or narcotics on Life Line Screening property, or location where our services are provided
- Fighting
- Harassment
- Any illegal activity
- Any other activity that the company, in its sole discretion, deems to be comparable to these.

The provisions of this Corrective Action policy are not a guarantee of its use. Life Line Screening reserves the right to terminate employment at any time, with or without reason. Additionally, Life Line Screening reserves the right to prosecute any employee for any of the above infractions.

## Open Communication

Life Line Screening encourages you to discuss any conflict you may have with a co-worker directly with that person. If a resolution is not reached quickly in a polite and respectful way, please arrange a meeting with your manager and/or a member of the Human Resources staff to discuss the issue. Please remember it is harmful to you and your co-workers to create or repeat rumors or office gossip. It is better to consult your manager immediately with any questions.

## Suggestions

You are encouraged to bring forward suggestions and good ideas about how Life Line Screening can be made a better place to work and our service to our customers enhanced. When you see an opportunity for improvement, please take a moment and submit your suggestion to a member of management. The monthly staff meeting at Corporate Headquarters is also an excellent opportunity for providing your suggestions, questions or comments.

LIF 00309



## Confidentiality / Protecting Company and Customer Information

Protecting our company's information is the responsibility of every employee and we all share a common interest in making sure it is not improperly or accidentally disclosed. Do not discuss Life Line Screening's confidential business with anyone who does not work for us. Financial information, sales records, screening sites, contact persons, operating procedures, supplier information, protocols, marketing techniques and information, results processing, and customer information are examples of the types of information considered confidential. Unauthorized distribution of this type of information or removal from the premises is cause for corrective action, including termination.

Life Line Screening's reputation has been built on excellent service and quality work. To maintain this reputation requires the active participation of every employee. Each employee must be sensitive to the importance of providing courteous treatment in all working relationships as well as maintaining the confidentiality of our business information.

Our professional ethic requires that each employee maintain the highest degree of confidentiality when handling business information. In order to maintain this professional confidence, no employee shall disclose business information to outsiders, including third parties and members of one's own family.

## Privacy Statement

Under HIPAA (Health Insurance Portability And Accountability Act) privacy laws, all employee medical information is kept in confidence by Life Line Screening. Employee records are kept in a confidential file. It is also critical for employees with access to our customer's private medical information to maintain strict confidentiality of such information. Customer information should not be discussed or shared with anyone outside the organization. Inside our organization, customer information should be shown only on a need to know basis.

## Immigration Law Compliance

All offers of employment are contingent on verification of your right to work in the United States. On your first day of work, you will be asked to provide original documents verifying your right to work and, as required by federal law, to sign Federal Form I-9, Employment Eligibility Verification Form. If you at any time cannot verify your right to work in the United States, Life Line Screening will be obligated to terminate your employment.

## Work Schedule

The Corporate Office regular hours are from 8:30 a.m. to 5:00 p.m. eastern standard time, Monday through Friday. The normal work week consists of five (5) days, each eight (8) hours long, Monday through Friday.

Your particular hours of work and applicable meal and break times will be determined and assigned by your manager.

LIF 00310



## Attendance and Punctuality

Attendance and punctuality are important factors for your success at Life Line Screening. Therefore, you are expected to report to work as scheduled and on time. Each department has specific procedures regarding calling in and how it addresses absences and tardiness. Your supervisor will provide you all the necessary details. Please feel free to ask questions. It is your responsibility to know and follow your department's policy on this topic.

In general, absence of three consecutive workdays without any notification is considered a voluntary termination of employment and you will be removed from the payroll without notice. Excessive absences and tardiness will be address accordingly and may result in disciplinary action up to and including termination (see Conduct and Corrective Action Policies).

## Driver's License and Driving Record

Employees whose work requires operation of a motor vehicle must present and maintain a valid driver's license and a driving record acceptable to us and our insurer. You will be asked to submit a copy of your driving record to Life Line Screening from time to time. You must report any and all motor vehicle violations and accidents, including speeding tickets, to your manager immediately. Failure to do so may result in corrective action, up to and including possible termination. If your manager is not immediately available, you are responsible for contacting and reporting the violation to another member of management.

## Employment Classifications

At the time you are hired, you are classified as either "exempt" or "non-exempt." This is necessary because, by law, employees in certain types of jobs are entitled to overtime pay for hours worked in excess of forty (40) hours per work week. These employees are referred to as "non-exempt" in this handbook. This means that they are not exempt from overtime pay (and therefore are eligible for overtime pay).

Exempt employees include managers, professional staff and other key employees whose duties and responsibilities classify them as "exempt" from overtime pay provisions as provided by the Federal Fair Labor Standards Act (FLSA) and any applicable state laws. If you are an exempt employee, you will be advised that you are in this classification at the time you are hired, transferred or promoted. If you have questions about your classification, please contact the Human Resources Department.

## Personnel Records

The task of handling employee records and related personnel documentation at Life Line Screening has been assigned to the Human Resources Department. Questions regarding insurance, wages, and interpretation of policies should be directed to your manager or a member of the Human Resources Department.

Life Line Screening shall maintain confidential records for each employee. Life Line Screening will strive to balance the desire to protect the employee information against Life Line Screening's need to collect and use employment information.

Upon experiencing any status changes such as legal name, address, birth, adoption, divorce, etc. you must notify the Human Resources Department within 30 days of the change, which is necessary for any applicable benefit/insurance changes. Failure to do so may result in ineligibility of employee or employee's dependent(s) for certain benefits.

10

LIF 00311



## Section 3:  Compensation

The goal of the compensation program at Life Line Screening is to attract qualified new employees, meet the needs of all current employees and encourage well-performing employees to stay with our organization.  With this in mind, our compensation program is built to balance the needs of both the employees and Life Line Screening.

**Compensation Philosophy**
It is the desire of Life Line Screening to pay all regular employees wages that are competitive in a way that will be motivational, fair and equitable.  Compensation may vary with individual performance and in compliance with all applicable statutory requirements.

**Pay Period**
Employees receive a paycheck every other Friday (26 pays per year).

**Direct Deposit**
Direct payroll deposit is the automatic deposit of your pay into the financial institution account(s) of your choice.  In addition, it may be possible for you to authorize Life Line Screening to make additional deductions from your paycheck, such as deductions for credit unions or payroll savings plans.  Contact the Human Resources/Payroll Department for details and the necessary forms.

**Error in Pay**
It is the policy of Life Line Screening to comply with the Fair Labor Standards Act (FLSA). If you are a non-exempt employee and you believe that there was an error in your pay or in the calculation of overtime compensation, please contact the Human Resources department.

Life Line Screening will pay exempt employees their full salary for any workweek in which they perform work, regardless of the number of days or hours worked, subject only to deductions that are permitted by law.  If you have questions about these permitted deductions please contact the Human Resources department.

It is the policy of Life Line Screening to investigate promptly and correct any improper payroll deductions or other payroll practices that do not comply with the FLSA.  If an employee believes that an improper payroll practice — such as an improper deduction from an exempt salary — has occurred, the employee should bring it to the attention of the Human Resources department.  The Human Resources department will review any matters regarding potential errors in pay and will reimburse the employee in the event that it is determined that any inappropriate deduction or incorrect calculation was made.

**Overtime**
Non-exempt employees are compensated for time worked in excess of forty (40) hours per week.  A workweek begins on Sunday and ends on Saturday.  Non-exempt employees will be paid at one and one-half of their regular rate for all overtime hours.  Part-time non-exempt employees must work over 40 hours in a workweek to be eligible for overtime pay.  Overtime must be authorized by a manager before it is worked.  Field employees should contact their supervisor concerning overtime pay.

LIF 00312